IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 30, 2014


IN RE J.F. ET AL.


**Appeal from the Circuit Court for Jefferson County**
**No. 23281      O. Duane Slone, Judge**


**No. E2013-01712-COA-R3-PT-FILED-AUGUST 28, 2014**


C.R.H. ("Mother") appeals the trial court's order terminating her rights to two minor children. The Department of Children's Services ("DCS") removed the children from Mother's care following allegations that she locked one child in a bedroom for three days without access to water, food, or a bathroom. The children entered protective custody and were adjudicated dependent and neglected. DCS filed a petition to terminate Mother's parental rights.[1] After a bench trial, the court found (1) that multiple grounds exist to terminate Mother's rights and (2) that termination is in the children's best interest, both findings said by the trial court to be made by clear and convincing evidence. Mother appeals. She challenges the trial court's findings with respect to grounds, but does not contest the best-interest determination. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Matt E. Miller, Jefferson City, Tennessee, for the appellant, C.R.H.

---

[1]The petition also named each child's father. B.M. is the putative biological father of J.F.; his parental rights were terminated in 2007 in an unrelated proceeding. R.F. is the adoptive father of J.F.; after the trial in the instant case, the court dismissed the petition as to him. J.D. is the biological father of B.H.; he did not appear at trial and his parental rights were terminated. None of the fathers are parties to this appeal. They are referenced only as necessary to present the facts relevant to Mother's appeal.

Robert E. Cooper, Jr., Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

This case concerns two of Mother's children – a daughter, J.F., and a son, B.H. (collectively "the Children").[2] The Children are half-siblings, born in 2003 and 2010, respectively.

Mother and R.F. had a long-term relationship, but never married. R.F. legally adopted J.F., and supported Mother and all three of her children. In 2009, Mother and R.F. ended their relationship. Mother left and she and J.F. went to a homeless shelter, where she met J.D. Within a month, she moved in with J.D. In December 2009, they were married. The following year, B.H. was born to their union. By all accounts, J.D. was violent and abusive. Around January 2011, Mother left J.D. and took the Children with her to another homeless shelter. The Children were removed from Mother and adjudicated dependent and neglected in a Cocke County proceeding. Around June or July of 2011, R.F. returned to help Mother and temporary custody of the Children was returned to her. Although R.F. and Mother did not resume their relationship, R.F., an over-the-road truck driver, allowed Mother and the Children to move into his apartment and he supported them. R.F. was away most of the time, but came home every weekend to visit J.F. and help Mother with the Children.

On February 24, 2012, DCS received a call from Christopher Gulley, a neighbor, who was concerned about eight-year-old J.F. Mr. Gulley reported that he had observed J.F. through a window in his residence for three days. On the second day, February 23rd, he asked J.F. if she was alright, and she told him, "no," that she was grounded and had had nothing to eat or drink and could not use the bathroom. Mr. Gulley brought over some potato chips and water and passed them to J.F. through the window. The following day, February 24th, he again saw J.F. in her room, and she again told him that she was not okay. He knocked on the door and asked Mother if J.F. could come out of her room; Mother told him that J.F. was grounded. Mr. Gulley went home and spoke to someone at the police department, and then contacted DCS. He was afraid if he did not call, "she might have died up there."

---

[2]In addition, the Children have another half-sibling, Mother's older son, D.F., who has been in the custody of Mother's parents since his birth.

After 8:00 pm that evening, DCS case manager Linda Vaughn and Officer Robert Peoples arrived at Mother's home to investigate. From the front door area, Ms. Vaughn could see into a window of a bedroom at the front of the apartment. She saw J.F. lying face-down and motionless on a mattress. Mother allowed Ms. Vaughn and Officer Peoples into the home. Ms. Vaughn saw a fabric "rope" tied to the handle of the door to J.F.'s room that was stretched across a hallway and tied to the hinge of an opposite door. She untied the rope from the hinge and entered the bedroom. There was a powerful urine odor. J.F. awoke and appeared "dazed" and was "lethargic" in talking with Ms. Vaughn. J.F. said that Mother grounded her to her room days earlier and she was not allowed her to eat or drink anything. She said a friend, Mr. Gulley, had passed her something to drink and eat, but Mother intervened and nailed the bedroom window shut. According to Ms. Vaughn, J.F. acted embarrassed because she had urinated in her clothing. She indicated she had also used a nearby bucket as a toilet. Ms. Vaughn observed the bucket to be nearly full of urine and also some feces. Officer Peoples testified in a similar manner with respect to the conditions he observed. He said that the rope tied between J.F.'s door and another door had to be untied in order to gain access to the room.

An ambulance was summoned and J.F. was instructed to pack a bag. J.F. went into the kitchen and packed some snack food. On leaving the apartment, Ms. Vaughn told J.F. to say goodbye to Mother. J.F. hugged Mother. According to Ms. Vaughn, Mother was stern, but calm and told J.F., "I told you one day your words would come back and bite you. I hope that you come back, but if you don't, you know why."

At the emergency room, J.F. complained of thirst. The treating physician, Dr. William Smith, initially "asked the nursing staff to, as far as fluids and food go, go ahead and give her more, whatever she'd like. . . ." Thirty minutes later, Dr. Smith examined her. He found J.F. to be "well-developed, well-nourished" and in "remarkably good spirits" considering the history he received. Based on urinalysis, Dr. Smith diagnosed J.F. with dehydration in the "mild to moderate" range. Dr. Smith found no symptoms of severe hydration but did not think this unusual; he explained that "dehydration is a continuum and those findings are present relatively late in that continuum." He further stated that with dehydration, children are "better able to compensate for significant stress until fairly late stages – at which point they, 'fall off the cliff,' and deteriorate . . . very rapidly." He was of the opinion that Adderall, a medication J.F. took for attention deficit hyperactivity disorder, would not lead to dehydration in and of itself. It can cause increased thirst, but should not cause dehydration if the patient has free access to water. Dr. Smith estimated that if J.F. had continued with no access to food or water, it "absolutely" had the potential to lead to her death in approximately a week.

Detective Roland Holt arrived at the apartment after J.F. had left. He noticed that the doorknob at J.F.'s bedroom door was turned around so that the lock was on the outside. Inside, he also saw a bucket filled with urine and some feces. The room was in "pretty nasty condition" and the window was nailed shut. On speaking with Mother, she admitted that she locked J.F. in her room to punish her, but said that the child had not been in there "that long." Detective Holt arrested Mother, but not without incident. B.H. had to be pried from her arms. Mother walked to the door, then laid down on the floor. Two officers carried her outside while she uttered a stream of profanities. As they reached the patrol car, Mother continued her tirade. Detective Holt related his exchange with Mother: "She said something along the lines of, 'That fucking cunt is not coming back to my house. She's cost me my son.' [A]t that time I'm not sure who she's talking about, so I asked her, 'Who are you talking about?' And she says, 'I'm talking about my fucking daughter.'" After being placed in the patrol car, Mother immediately kicked out the rear glass window.

DCS took the Children into protective custody and they were placed in foster care. In March 2012, DCS filed a petition alleging that they were dependent and neglected and the victims of severe child abuse in Mother's (and R.F.'s) custody. As a result of her disruptive behavior, J.F. was removed from three different traditional foster homes before being admitted to Parkridge Valley Hospital for psychiatric care. Mother was indicted for aggravated child neglect and especially aggravated kidnapping. Pursuant to a plea agreement, she entered a guilty plea to child neglect and was sentenced to two years in prison.

On May 21, 2012, DCS filed a petition to terminate Mother's parental rights. An amended petition followed in May 2013. In September 2012, after a trial, the juvenile court adjudicated the Children dependent and neglected as the result of severe abuse by Mother and the failure of R.F. to protect the Children from said abuse. Mother and R.F. appealed. The appeal from juvenile court and the petition to terminate were consolidated for hearing in the trial court.

In July 2013, a four-day trial was held. Mother described J.F. as a smart, sweet child. She was also difficult as a result of anger and behavior issues. As one example, J.F. had been suspended from kindergarten many times and then expelled after she head-butted her teacher in the face. Just before her removal, Mother had taken her to see a counselor. She said that she and J.F. had many good days together, but at least two to three times a week, the child went into a "rage," and became uncontrollable and destructive and tried to hurt herself or others. Besides a mattress, there was no furniture or decorations in J.F.'s room because she had broken and destroyed everything she had. Her room always smelled of urine because J.F. wet the bed every night without exception. Mother explained that she had originally placed a bucket in J.F.'s room so that she might use it when she woke up to find herself urinating

at night. Mother and R.F. decided against physically disciplining J.F. Mother believed sending her to her room to calm down was the best option. Mother testified she had fashioned a makeshift door alarm that caused soda cans to make noise to alert her if J.F. opened her bedroom door at night to prevent her from getting out unnoticed and into trouble.

Mother acknowledged that the week of the Children's removal had been difficult with conflicts between her and J.F. J.F. was home from school all that week because Mother had misinterpreted the school calendar and kept her home following a break that actually ended that Wednesday. Mother admitted that over the course of the days in question, she had sent J.F. to her room, her "standard" punishment, but said she never locked her in and never kept her there for more than an hour or two at a time. Mother said she did what she thought was best, and did not feel her discipline was abusive.

At the time of trial, the Children had been in foster care for seventeen months and had had no contact with Mother. DCS was making efforts to move J.F. from Parkridge Valley to a therapeutic foster home. B.H. remained in a pre-adoptive foster home. Since being released from prison in January 2013, Mother had been living with her father who supported her. Mother recognized that if her rights were not terminated, the Children could not come straight home. She conceded she did not have the ability to handle J.F. by herself and estimated she would need another six to eight months to prepare herself for the Children's return.

At the conclusion of the trial, the court terminated Mother's parental rights upon finding that grounds for termination were established by clear and convincing evidence. As to Mother, the court found that DCS had sufficiently proven each of the grounds cited in the petition – abandonment by conduct evincing a wanton disregard for the Children's welfare; severe child abuse; and a sentence of more than two years for severe child abuse. The court further found clear and convincing evidence to show that termination was in the Children's best interest.

In addition, the trial court deemed void the juvenile court's September 2012 order adjudicatory order for lack of subject matter jurisdiction.[3] As to R.F., the court dismissed the

---

[3]The record reflects that In June 2011, an adjudicatory hearing concerning the Children was held in the Juvenile Court for Cocke County. In its adjudicatory/dispositional order, that court decreed the Children dependent and neglected because Mother had been homeless and unable to care for them. The court ordered that temporary custody of the Children be returned to Mother, subject to further orders of the court. In vacating the Jefferson County Juvenile Court's subsequent adjudicatory order in the present case, the trial court observed that "there is no evidence . . that that court knew of the prior Cocke County order." The trial court concluded that while the Jefferson County Juvenile Court had and has authority to issue temporary
(continued...)

termination petition and remanded the case to the Jefferson County Juvenile Court with instructions to contact the Cocke County Juvenile Court to determine whether the case should be transferred to Jefferson County. Mother filed a timely notice of appeal.

II.

Mother presents issues for our review that we restate slightly and address as follows:

> Whether the trial court committed clear error in its factual finding that J.F. was confined to her room for three consecutive days.

> Whether the trial court erred in terminating Mother's parental rights based on her two-year prison sentence absent a finding that the conduct which led to her incarceration constitutes severe child abuse.

> Whether the trial court erred in finding that there was clear and convincing evidence of Mother's wanton disregard for the welfare of the Children.

III.

In cases involving the termination of parental rights, this Court's duty is "to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). "This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro*., 778 S.W.2d 423, 426 (Tenn. 1989). Questions of law are reviewed de novo with no

---

[3](...continued)
orders as necessary to protect the best interests of the Children – who currently reside in Jefferson County – it was "without jurisdiction to make any final adjudicatory orders pertaining to these children, and they are hereby found to be void."

presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and also the government, they are not absolute, and they may be terminated upon a showing of an appropriate statutory ground. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).   A parent's rights may be terminated only upon a finding by the court that (1) "the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c)(Supp. 2013); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes  that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful that only a single ground must be clearly and convincingly proven to justify a basis for termination. *In re Audrey S*., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

A.

Taken together, Mother's first issues essentially challenge two of the three grounds for termination – severe child abuse and a two-year sentence for conduct deemed severe child abuse.  Mother asserts that these grounds cannot stand because, in her view, (1) the trial court erred in finding that she in fact confined J.F. to her room for three days and (2) the trial court made no explicit finding that Mother committed "severe child abuse," and the evidence is insufficient to support such a finding.  In this section, we address these arguments in turn.

At issue are the following two grounds for termination as set forth in Tenn. Code Ann. § 36-1-113(g):

> (4) The parent or guardian has been found to have committed
> severe child abuse as defined in § 37-1-102, under any prior

order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian;

(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian[.]

Tenn. Code Ann. § 36-1-113(g)(4), (5). In turn, Tenn. Code Ann. § 37-1-102(b)(23)(A)(i) (Supp. 2013) defines "severe child abuse," in relevant part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death. . . . " Pursuant to Section 37-1-102(b)(23)(a)(ii), " '[s]erious bodily injury' shall have the same meaning given in § 39-15-402(d)." Lastly, Section 39-15-402(d)(Supp. 2013) provides that "[s]erious bodily injury to the child includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

B.

Mother asserts that the trial court's finding that J.F. was confined to her room for three days is clear error. She contends that the court erred in crediting the testimony of several state's witnesses, none of whom had sufficient knowledge as to what actually transpired in the home, over her own first-hand account.

The trial court found as follows:

-8-

The Court accredits the testimony of Christopher Gull[e]y, who observed the child, [J.F.], in her room on three separate days, gave her food and drink, and asked [Mother] on the day of [Mother's] arrest sometime approximately midday if [J.F.] was grounded, and [Mother] answered that she was. The Court notes that DCS and law enforcement were advised of the potential that [J.F.] was in possible danger in the early afternoon on that date. The Court discredits the testimony of [Mother] that [J.F.] had only been confined in her room for only 15 to 20 minutes prior to the officers and Ms. Vaughn arriving. Likewise, the Court discredits [Mother's] other testimony which contradicts the testimony of witnesses Ronald Holt, Lynnie Vaughn, [J.F.], and Christopher Gull[e]y. Based upon the evidence, the Court finds that the child was isolated in her room for more than three days consecutively. The Court makes all these findings by clear and convincing evidence.

Mother states that the "state's entire case against [her] hinged on proving that [J.F.] was confined to her bedroom without access to food or water for an extended period of time." She concludes that the evidence at trial, viewed under a clear and convincing standard, preponderates against the court's finding to this effect and should be reversed.

At trial, the court heard from DCS case manager Vaughn, the first to arrive at the home and speak with J.F. on the night of February 24th. Ms. Vaughn testified that she "immediately went over and unsecured the rope from the hinge, which it was tied to, to gain entry to the room to check on the child." She found J.F. to be lethargic and pale, but able to respond and stand on her own. Her pants were wet. On direct examination, Ms. Vaughn related her discussion with J.F. as follows:

> A: [Ms. Vaughn]: We[4] asked her . . . why she was in there, and she responded that she had gotten in trouble and got grounded to her room. We asked when that had occurred, and she said not the day before but the day before that, which then that would be the third day when I was there.

* * *

---

[4] It is assumed that Ms. Vaughn is referring to herself and Officer Peoples as they arrived together.

Q: [Counsel]: Did she say anything about whether she could leave the room?

A: She said that she was not allowed to leave the room, that she hadn't ate or drank or was able to use the restroom.

Q: Now, regarding the door being locked or not being able to leave, did you observe anything about the doorknob of the door?

A: The doorknob . . . had been switched around so the passage lock instead of being on the inside of the room . . . was switched to the outside.

Q: Was that locked as well in addition to the blue rope you spoke about?

A: It was not.

* * *

Q: Had she been able to eat anything at all while she was in there?

A: She did tell us that she was given some water and chips from her friend, who was a neighbor.

Q: Okay. Did she say who that was?

A: She named him by Chris.

Q: Did she say what happened after she received the food and drink from Chris?

A: She said it was on two separate occasions and that he had given her chips and water. And the chips that she had were hot, and so he brought her back some ice and water and that her mom had caught him bringing . . . the water the second time.

Q: Did she say what her mother did after she caught them?

A: She said that's when the mom had nailed the window shut so
that she couldn't be passing things through the window.

The trial court viewed the forensic interview of J.F. conducted less than two weeks after her removal. J.F. stated she had gotten into trouble and Mother "stuck" her in her room as punishment and "tied [the] door shut." She said: "The day she stuck me in there, I stayed in there for the rest of the day, and I stayed in there all night and all day the next day and then I stayed in there all that night and then the next day." She said she saw her friend, "Chris," and told him she hadn't been out of her room in "three and a half days," and he gave her some food and water. After that, Mother nailed her window closed. According to J.F., Mother was "really mean and mad" and this was the first time she was locked in her room without food or water. She reiterated that Mother gave her "nothing" and she had to go to the bathroom in a bucket that Mother had given her to wash her walls where she had colored on them. She conceded that Mother had tried to keep her in her room other times, by using a dog leash, but nothing worked because she, J.F., was "strong" and usually came right back out. J.F. said that keeping her in her room for three and a half days was the worst thing Mother had ever done to her.

In other testimony, Leigh Anthony, a social services worker who was involved in J.F.'s therapy and treatment at Parkridge Valley, testified to J.F.'s statements that Mother had confined her to her room using a piece of fabric, she used a bucket as a toilet, her neighbors gave her things until Mother shut her window, and she was afraid of her home and of Mother. Ms. Anthony testified that J.F.'s statements never varied since her admission more than a year earlier.

Mother related her account of the period in question. She agreed that J.F. was frequently in her room, both to play and when she was being punished. On February 23rd, J.F. spent time in her room and was in trouble "off and on" throughout the day. Mother recalled that J.F. ate three meals that day. It was R.F.'s birthday and Mother recalled that she and J.F. called him that day and sang to him. R.F. corroborated Mother's testimony on this point. He recalled that J.F. was "excited" about him coming home and they were planning a "breakfast for dinner" meal for him. R.F. further testified that he had never known Mother to deprive J.F. of food and that he and Mother usually discussed J.F.'s punishment. Although R.F. said he was not always comfortable with sending J.F. to her room, the longest period he recalled her staying there was half a day.

Mother said that on either the 23rd or 24th, J.F. had played at a girlfriend's house. J.F. also went with Mother to the grocery store to buy items for a birthday dinner they planned for R.F. According to Mother, on February 24th, J.F. ate a sandwich for lunch. That evening, Mother prepared chicken and rice and J.F. did not eat it because they were mixed

-11-

together. Mother and J.F. had an argument that began after dinnertime. J.F. had not taken out the trash as Mother had instructed and had a "bad attitude." Mother sent J.F. to her room, and J.F. had a fit, as was typical. J.F. yelled and cursed and continued coming out of her room. Mother turned the knob around because J.F. was angry and Mother was afraid she would lock herself in and tear up something.

According to Mother, J.F. was never "locked in," only sent to her room for punishment, and she could have opened the door to go to the bathroom, etc., at any time. Mother said if she wanted to actually lock J.F. in her room, she would have simply locked the door; instead, she tied the band to the door while J.F. was watching to make her believe that she was locked in. Mother said she finally told J.F. just to go to bed for the night. J.F. eventually calmed down. Mother assumed she was asleep when DCS arrived some two hours later. Earlier that day, Mr. Gulley, whom Mother indicated was mentally challenged and sometimes "played" with J.F., came by. Mother told him she was in trouble and could not play. Mother added that on that day, she had filled the bucket from J.F.'s room with water and J.F. was supposed to use it to clean her walls. Mother said that the urine in the bucket was a result of the child using it after she was sent to her room between 7 p.m. and the time DCS arrived some two hours later.

Mother stated that J.F. sometimes lied or told big "stories" and wasn't surprised that she told Mr. Gulley she had been locked in her room for days with no food or water. Mother asserted that it was also a lie that Mr. Gulley was able to pass anything through J.F.'s window. According to Mother, she had nailed J.F.'s window shut months earlier because J.F. once climbed out in the middle of the night. At the same time, Mother could not explain the similarity in the detailed accounts of J.F. and Mr. Gulley as to what took place with the child in the room.

We have reviewed the evidence, mindful that only two people know what actually transpired during the time in question – Mother and J.F. – and their accounts certainly conflict. The trial court heard from other witnesses who provided circumstantial evidence and expressly credited their testimony, together with J.F.'s own account, over that of Mother. This was certainly within the court's province as it was able to observe the witnesses as they testified. "One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations." *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). "Accordingly, appellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary." *Id*.

On our considered review of the entire record, we conclude that the evidence does not preponderate against the trial court's findings, said to be made by clear and convincing evidence, that J.F. was confined to her room for three consecutive days.

C.

Mother challenges the trial court's failure to expressly find that her conduct with respect to J.F. constituted "severe child abuse" for purposes of parental termination. She concludes that absent such a finding, and the evidence to support it, the grounds that depend upon such a finding cannot support the termination order.[5]

In addition to the findings quoted above, the trial court further found, in relevant part, as follows:

> With regard to [Mother], the Court finds by clear and convincing evidence that it has been shown that she has been sentenced to more than two years imprisonment for conduct against the child that is subject to this petition, specifically, [J.F.], and against the one-half sibling of [J.F.], specifically, [B.H.]. The Court cites the evidence contained in Collective Exhibit No. 52.[6]
>
> The Court accredits the testimony of Dr. William Smith, and finds that this proof is clear and convincing, that [J.F.] was tested by urinalysis at the hospital and the diagnosis was dehydration; that if the situation had continued, it would have resulted or could have resulted in serious bodily injury or death; and, if it had persisted, it would have. The Court further finds that this testimony of Dr. William Smith was consistent with the testimony of [J.F.] and Christopher Gull[e]y. In the [M]other's own words, [Mother] testified, "If I actually had her in her room for three days, I would agree it was severe abuse."

---

[5]Both parties correctly note that in view of the adjudicatory order being vacated, the trial court could not rely on the juvenile court's finding of severe abuse by Mother to summarily terminate her parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(4)(providing a ground for termination where the parent has been "found to have committed severe child abuse . . . under any prior order of a court. . . .").

[6]Exhibit 52 contains the judgment convicting Mother of child neglect and sentencing her to two years in prison.

In concluding its order, the trial court stated: "By clear and convincing evidence, and pursuant to Tenn. Code [Ann.] § 36-1-113(i), the Court finds that the grounds for termination of parental rights have been met against [Mother]. . . ."

Mother correctly states, and the State essentially concedes, that the trial court did not expressly say that Mother's conduct constitutes "severe child abuse" under the applicable statutes, nor did it cite the applicable statutory grounds for termination. The State takes the position that the trial court made an implicit finding of severe abuse that is supported by clear and convincing evidence. We agree with the State.

We have already upheld that portion of the trial court's order finding that Mother confined J.F. to her room for three days consecutively. With J.F.'s extended confinement so established, the trial court pointed to Mother's concession that "If I actually had her in her room for three days, I would agree it was severe abuse." Next, the trial court cited the evidence of Mother's two-year sentence for this conduct together with the evidence of J.F.'s dehydration following her confinement. Tracking the language of Section 37-1-102(b)(23), (defining "severe child abuse"), the trial court concluded that "if the situation had continued, it would have resulted or could have resulted in serious bodily injury or death; and, if it had persisted, it would have." In our view, while the trial court's findings were somewhat imprecisely stated, it is clear that the court made an implicit finding that Mother's conduct meets the definition of "severe child abuse" for purposes of a parental termination proceeding. It follows that both severe child abuse and a two-year sentence for conduct deemed severe child abuse, as cited in the petition, were established as grounds for termination.

Lastly, on our independent review of the entire record, we reach the same result. That is, we conclude that "the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate [Mother's] parental rights." *See In re M.J.B.*, 140 S.W. 3d 643, 654 (Tenn. App. 2004). The termination of Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4) and (5) is affirmed.

V.

The trial court terminated Mother's rights pursuant to Tenn. Code Ann. § 36-1-102 (1)(A)(iv) based on its finding of clear and convincing evidence to establish that Mother engaged in conduct prior to her incarceration that exhibited a wanton disregard for the Children's welfare. Mother insists that there is insufficient evidence to support the court's finding of said ground. She states that there is nothing to show that she is a habitual criminal or a drug abuser, for example, as is often the situation in cases of wanton disregard. She

concludes that the fact she admittedly made a "bad parenting choice" with respect to the incident with J.F., and that she was homeless as a result of leaving an abusive spouse, are not sufficient examples of wanton conduct that would justify terminating her parental rights.

Tenn. Code Ann. § 36-1-113(g)(1) includes abandonment as a ground to support a parental termination order. The Code defines "abandonment," for purposes of a termination proceeding, to mean that,

> [a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or *the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .*

Tenn. Code Ann. § 36- 1-102 (1)(A)(iv)(emphasis added). The Code does not expressly define the type of conduct that is deemed to exhibit "wanton disregard" for a child's welfare. This Court has repeatedly held, however, that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." **In re: Audrey S**., 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

In support of its finding of abandonment by wanton conduct, the trial court stated, in relevant part:

> The Court . . . finds by clear and convincing evidence that [Mother] has lived a life of demonstrating emotional instability and has subjected the [C]hildren to multiple episodes of domestic violence; particularly [] involving her husband, [J.D.]. [Mother] has demonstrated a long-standing pattern of subjecting [J.F.] to emotional and psychological harm and neglect. The Court finds by clear and convincing evidence that [Mother's] parenting shows wanton disregard for the health and well-being

-15-

of [the Children].  The Court finds particularly instructive the deposition testimony of Leigh Anthony.  For example, the Court would direct any reviewing court to the discussion about the micro-psychotic behaviors that have been manifested, or were manifested, by [J.F.] and were consistent with lack of nurturing and the history given by [J.F.].  Ms. Anthony's testimony is accredited by the Court.

The proof showed that in May 2012, J.F. was admitted to Parkridge Valley Hospital, a "level four" psychiatric facility, after being removed from her former foster home for being disruptive. After a psychiatric evaluation, J.F. was diagnosed with major depressive disorder with "micro psychotic features" – strange behaviors such as hoarding dead bugs, storing fingernail clippings in her cheeks, crawling around the floor and staring at the corners of the room.  Other diagnoses included oppositional defiance, ADHD, and chronic post-traumatic stress disorder.   Leigh Anthony, J.F.'s social worker at Parkridge, reported that when J.F. first arrived, she was fearful, aggressive, defiant, and very angry.  She often acted out – yelling, screaming and hitting things in an effort to hurt herself or others.  Based on her interactions with and treatment of J.F., Ms. Anthony believed that J.F. had been abused by Mother and that her behavioral issues were attributable to a lack of nurture rather than nature.

With respect to the court's other findings, we can appreciate Mother's position that, most recently, she was again homeless and unable to provide for the Children – because she decided to flee her abusive spouse, J.D.  At the same time, Mother's testimony established that she essentially chose to become a single, homeless parent to J.F. the first time when she left R.F. in February 2009 and took J.F. with her to a homeless shelter.  Within a month, she began a relationship with J.D., whom she met at the shelter, and moved into his home.  They married before the year ended.  During Mother's pregnancy with B.H., J.D. became abusive. J.F. witnessed the signs of the abuse he inflicted; she said she saw "purple marks" on Mother, scratches and bleeding.  Mother remained until an incident when she intervened as J.D. attempted to hit J.F., and he ended up striking baby B.H. in the head.  This time, Mother left with two young children and remained in a shelter in Cocke County for about six months. Her inability to care for and provide for the Children at that time led DCS to remove the Children from her custody for a time. The record suggests that custody of the Children was returned to Mother only after she was able to secure a place to live and a means of support, all of which were provided by R.F. Unfortunately, any stability Mother was able to achieve with R.F.'s help was short-lived. Within a year, as a result of her actions toward J.F., Mother was arrested and the Children were again removed before Mother went to prison. Meanwhile, the Children were placed in foster care.

In addition to confining J.F. to her room, Mother seemingly tried to instill fear in the child. Ms. Vaughn testified that as J.F. left for the hospital, Mother told her, in a "stern, . . . normal tone," "to remember what her counselor told her, that what she would say could come back and bite her." Further, J.F. said that before the night of her removal, Mother had warned her "that if DCS ever got involved, that she would make sure that she and the baby were long gone and would leave [J.F.] behind."

In other areas, J.F. indicated that her older brother, D.F., often touched her and had inappropriate sexual contact with her when she and R.F. visited the home where D.F. lived with Mother's father and stepmother.[7] J.F. said that they exposed their private parts to each other and had gotten on top of each other and done "the wrong thing." She was afraid of him and said he hit and hurt her if she refused to participate. She said R.F. had caught them two or three times, spanked her and separated them. Mother agreed that D.F. had had sexual contact within the year that J.F. was removed. She declined, however, to characterize D.F.'s conduct as "sexual abuse." Mother admitted that R.F. had told her of catching D.F. and J.F. in appropriate behavior, so they agreed to keep the children separated from each other. The proof showed, however, that J.F. continued to accompany R.F. on visits to D.F.'s home, including for overnight stays. Mother admitted that J.F. told her she was afraid of D.F., but Mother had no objection to the continued visits and was content to stay home with B.H.

In addition to the foregoing facts, Mother admitted that she had smoked marijuana in the past. She also testified to having a "petition" filed against her in Putnam County following her arrest for public intoxication after she took a Clonopin pill that was not prescribed to her. Lastly, despite her proven inability to provide for the Children without relying on her parents or the men in her life for support, Mother chose not to work the entire time that the Children were in her care.

Based on the foregoing, we conclude that the evidence does not preponderate against the trial court's findings in support of its termination of Mother's rights on the ground that her pre-incarceration conduct showed a wanton disregard for the Children's welfare.

VI.

Upon finding the existence of grounds for termination, the trial court turned to a consideration of the Children's best interest. The trial court expressly stated that it

---

[7]R.F. testified that he met Mother when D.F. was an infant and he has always considered D.F. as his own child. R.F. regularly visits D.F. and remained in his life following their break-up.

considered all of the non-exclusive factors enumerated in Tenn. Code Ann. § 36-1-113(i).[8] The court placed "great weight" in the following factors:

> The Court finds that to permit either child to reside with [Mother], based on her life history, would be extremely detrimental to the [C]hildren's emotional, psychological and medical conditions, and would be extremely detrimental to them. The Court finds that [Mother] has been emotionally and psychologically abusive to [J.F.] and has neglected the wellbeing of [J.F.]. The Court finds that [Mother's] mental and emotional status would be detrimental to the [C]hildren and prevent her from effectively providing safe and stable care and supervision for the [C]hildren. Accordingly, the Court finds by

---

[8]Subsection (i) provides as follows:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

clear and convincing evidence that it is in the best interest of both [C]hildren that [Mother's] parental rights, responsibilities, and obligations should be and are hereby terminated. The Court finds that any single factor regarding best interest is sufficient in and of itself – factors 1, 2 and 3 with regard to [J.F.], and factors 1 and 3 with regard to [B.H.] – for the Court to reach [the] conclusion that it is in the [C]hildren's best interest to terminate [Mother's] parental rights.

As we have noted, Mother does not appeal the trial court's best interest determination. Again, however, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven — "not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d at 546)(citing Tenn. Code Ann. § 36-1-113(c)). Accordingly, we have reviewed the trial court's best-interest determination despite Mother's apparent waiver of this issue.

The proof showed that both children were doing well in their current living arrangements. B.H. was in the same pre-adoptive foster home for some thirteen months and seemingly well-adjusted; he called his foster mother "mama." As to J.F., over the course of six to nine months, her problematic behavior had "decreased dramatically" with medication, ongoing counseling and various therapies. She was generally more calm with a corresponding improvement in her behavior. J.F. continued to express fear that Mother would "kill her" because she had reported what Mother had done to her.

Ms. Anthony believed that J.F. would do best in a two-parent home without younger children as she required a greater amount of structure and closer supervision that other children her age. In short, J.F. was ready to leave Parkridge for a "level three, therapeutic foster home," and would need a very "structured, nurturing home environment." Ms. Anthony conceded that it could take a while for a foster home to be found, but noted that Omni Vision had begun a state-wide search for an appropriate home. Ms. Anthony was concerned that being returned to Mother "would certainly set her back and any treatment or progress she has made could potentially go away."

Our review satisfies us that the evidence does not preponderate against the trial court's determination, said to be made by clear and convincing evidence, that termination of Mother's parental rights is in the best interest of the Children. We therefore uphold the termination order.

VII.

The judgment of the trial court terminating Mother's parental rights is affirmed. Costs on appeal are taxed to the appellant, C.H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.


_____
CHARLES D. SUSANO, JR., CHIEF JUDGE